IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

MIDLAND NATIONAL LIFE   )
INSURANCE COMPANY,    )
              )
   Plaintiff,      )
              )
v.            )  CIVIL ACTION NO.
              )  06-0429-BH-M
KARON B. TURNER, et al.,   )
              )
   Defendants.    )

**FINDINGS OF FACT; CONCLUSIONS OF LAW
AND ORDER**

   This interpleader action is before the Court on the cross-motions for summary judgment filed by the two defendants, Alice Bats Turner (Docs. 32-35) and Karon B. Turner (Doc. 38).   Upon consideration of these motions, the briefs in opposition thereto (Docs.  41 and 42), the respective reply briefs (Docs. 43 and 44), and all other pertinent portions of the record, the Court concludes that Karon Turner's motion is due to be granted while Alice Bats Turner's motion is due to be denied.

**FINDINGS OF FACT**

   Upon consideration of all the evidence of record, both testimonial and documentary, the Court finds that the following facts are either undisputed or uncontradicted by Alice Bats Turner:

1.      On September 21, 1978, Wallace Turner divorced his first wife, Alice Bats Turner ("Alice Turner").  Pursuant to the divorce decree, Wallace Turner provided Alice Turner with two homes, alimony, and his retirement benefits for Jim Walters.

2.      At the time of his divorce from Alice Turner, Wallace Turner was the president and chief operating officer of McWane Corporation ("McWane") in Birmingham, Alabama. (Wallace Turner Depo., Doc. 35-2,  at pp. 22-24.)  If Wallace Turner was retired from McWane on or before February 1, 1989, then his obligation to pay Alice Turner $75,000 per year in alimony terminated on February 1, 1989; if Wallace Turner continued as president and chief operating officer of McWane beyond February 1, 1989, then his obligation to pay $75,000 per year in alimony continued until his retirement. (Divorce Decree, Doc. 38-2, at ¶ 2.)

3.      As a part of their divorce decree, Wallace Turner and Alice Bats Turner further agreed that Wallace Turner was to maintain life insurance on his life for the benefit of Alice Turner until Wallace Turner reached the age of retirement.  (Divorce Decree, Doc. 38-2, at ¶ 12.)  The terms of the parties' Agreement required Wallace Turner to increase an existing life insurance policy to the face amount of $600,000 and to name Alice Turner as the beneficiary of this policy.[1]  (*Id.*)  The Agreement further provided that, on January 1, 1984, the face amount of the policy "shall be decreased" to

---

[1]At the time of his divorce, Wallace Turner had a Liberty National Life Insurance Policy with a face value of $300,000 which he agreed to increase to $600,000.  (Divorce Decree, Doc. 38-2, at ¶ 12.)

$350,000, but that Wallace Turner "shall cause said policy to remain in full force and effect until [Wallace Turner's] obligation for the payment of $75,000.00 per year alimony shall terminate." (*Id.*)

4.     In 1979, Wallace Turner purchased three (3) $300,000 American Foundation Life Insurance policies through his insurance agent, Marcus Cassimus ("Cassimus").  (Wallace Turner Depo., Doc. 35-2,  at pp. 22-24.)  The designated beneficiary on two (2) of these policies, totaling $600,000, was Alice Turner.  The remaining $300,000 policy was for the benefit of Karon Turner.

5.     In 1980, Wallace Turner retired from McWane.  (Wallace Turner Depo., Doc. 35-2,  at pp. 25.)  As a result, his obligation to pay Alice Turner alimony of $75,000 per year and to maintain any insurance for Alice Turner's benefit was to end on February 1, 1989.  (Divorce Decree, Doc. 38-2, at ¶¶ 2 and 12.) Commencing January 1, 1984, and continuing until February 1, 1989, Wallace Turner was required only to maintain $350,000 in insurance for Alice Turner's benefit. (*Id.*)

6.     In 1983, Wallace Turner transferred the three American Foundation policies into three (3) $300,000 Midland Insurance Company ("Midland") insurance policies. (Wallace Turner Depo., Doc. 35-2,  at p. 48.)  According to Cassimus, his insurance agent, the premiums for the Midland policies were "significantly cheaper" than the premiums for the American Foundation policies.  (Cassimus Depo., Doc. 35-5, at p. 37.)

7.     One of the $300,000 Midland policies, Policy Number 01030367, designated "Alice B. Turner – Ex-wife" as the primary Beneficiary.  (Doc. 35-6 at pp. 12

3

and 13.)  A handwritten note on this policy application states: "Issue alternative policy in the amount of $250,000 . . . [pur]pose of policy is per divorce agreement."  (*Id.*)  The fact that neither the $300,000 nor the $250,000 amounts comply with the divorce decree is irrelevant for the reasons set forth below.  It is undisputed that Wallace Turner intended to, and indeed did, designate Alice Turner as beneficiary to only one of these policies in an amount of $300,000.

8.     The two other Midland policies, Policy Numbers 01030375 and 01030376, were issued on August 26, 1983 and October 1, 1983, respectively, and designated "Karon B. Turner – Wife" as the Primary Beneficiary as well as owner of the policies . (Docs. 35-7 and 35-8.)

9.     In September of 1987, Cassimus and his wife, Zoe Cassimus, went to Point Clear, Alabama to visit Wallace and Karon Turner.  (Karon Turner Depo., Docs. 35-4 and 38-8 at pp. 58-59; Cassimus Depo., Docs. 35-5 and 38-6, at p. 49.)  On September 25, 1987, just prior to the Cassimus's departure, Marcus Cassimus presented Wallace Turner with a number of documents to sign in order to convert his three separate Midland life insurance policies into a single Midland policy with a face value of $900,000, Policy Number 01420922.  (Karon Turner Depo., Docs. 35-4 and 38-8 at pp. 58-59; Cassimus Depo., Docs. 35-5 and 38-6, at pp. 49, 60-61 ; Docs. 35-9 and 38-7.)  This policy was a "flexible premium adjustable" life insurance policy.

10.     Among the documents executed by Wallace Turner on September 25, 1987, was a "Client Services Request" on a form provided by Midland Life Insurance Company

4

and therein designated Karon Turner as the sole owner of the $900,000 Midland policy. (Docs. 35-10 and 38-10.)  The portion of this form for changing the beneficiary is left blank while the portion by which Wallace Turner changed ownership to Karon Turner clearly states: "Beneficiary designation currently in effect does not change unless indicated above." (*Id.*)

11.     In addition to the above, however, Wallace Turner simultaneously executed on September 25, 1987,  his "Application For Policy Change, Conversion or Reinstatement" on which he designated Karon Turner not only as the owner of the $900,000 policy but also as the primary beneficiary.[2]  (Doc. 35-11 at pp. 3 and 8.) Cassimus confirmed during his deposition that, at the time the three policies were converted into the $900,000 policy, Wallace Turner "understood that [Karon Turner] was the beneficiary of the $900,000 [policy]."  (Cassimus Depo., Doc. 38-6, at p. 69.)

12.     The "application" executed by Wallace Turner was also executed by Karon Turner on September 25, 1987, and indicates that certain premiums already paid for two of the original Midland policies plus additional premiums accompanying the application were to be applied to the new $900,000 policy.[3]  (Doc. 35-11at pp. 1-2.)  Consequently,

---

[2]Although Alice Turner contends that "no separate beneficiary designation was made as part of the Application for the $900,000 policy [but] [r]ather, beneficiary designations from two (2) of the three (3) previous policies were simply attached to the Application," the evidence she submits actually proves otherwise in that the document clearly establishes that Karon Turner was designated as the primary beneficiary on the application. (Doc. 35-11 at pp. 3 and 8.)

[3]According to the application, Midland National Life Insurance Co. Was to: "Apply this years premium of $4,261.00 on Policy # 1030367 and $4,261.00 on Policy # 1031375 to new policy! Enclosed is check for balance $12,435.00.  Total annual premium will be $20,954.00."

the $900,000 policy was to be effective from "7-1-87." (*Id.*)  The $900,000 policy

subsequently issued therefore indicated an issue date of "07/01/1987."  (Docs. 35-9 and

38-7.)

  13. On February 1, 1989, Wallace Turner's obligation to maintain any life

insurance benefits for Alice Turner ended.

  14. Sometime in 1998, Wallace and Karon Turner began receiving substantial

increases in premiums on the $900,000 policy.  Consequently, in 1999, Wallace Turner

and Karon Turner filed a lawsuit against Cassimus and midland styled *Wallace L. Turner*

*and Karon B. Turner v. Midland National Life Insurance Company, et al.,* in the Circuit

Court of Jefferson County, Alabama, Case Number CV-1999-523.  (Doc. 35-14).

According to Karon Turner, they had the $900,000 policy reduced to $600,000 during the

pendency of that litigation because they could not afford to pay the increasing premiums.


  15. Ed Ahrens, an insurance broker who assisted Wallace and Karon Turner

with the reduction of the face value of the $900,000 Midland policy, testified:

> They explained to me why they had bought the insurance. The $900,000
> was designed to provide a benefit at [Wallace's] death to Karon.

(Ahrens Depo., Doc. 38-11, at p. 29.)  During the litigation with Midland, Wallace Turner

himself testified as to his intention regarding the proceeds of the $900,000 policy.  In

answer to a question about why he kept the $900,000 policy in force after his obligation

_____

(Doc. 35-11 at p. 1.)

to Alice Turner ceased, Wallace Turner testified that "[t]he main purpose was to protect

my current wife [Karon Turner]."  (Wallace Turner Depo., Doc. 38-12, at p. 58.)  He

further testified:

> I have a retirement under Jim Walter Corporation.  At my death, the
> benefits go to my first wife . . . I have Social Security which goes to my
> first wife.  There's absolutely nothing for my second wife except what I
> provided for her with insurance.  That's what I'm trying to do."

(*Id*. at pp. 58-59.)  Wallace Turner further testified that, at his death, his first wife, Alice

Turner, would "get my Social Security payment, and [] my check from Jim Walter

Corporation" and that, because of this, his second wife, Karon Turner, would get no

support other than the $900,000 policy benefits.  (*Id*. at 115-16.)

        16.      Midland National did not issue a new policy for the reduction to $600,000.

Shortly before trial, Wallace and Karon Turner reached a settlement with Midland.

Pursuant to the settlement, Midland agreed that the death benefit on the policy Karon had

reduced to $600,000 "shall be increased to $900,000 and shall remain so until [Wallace

Turner's] death" and that "no further premiums shall be required by the undersigned to

keep the policy in force."  (Settlement agreement, Doc. 38-13).  Midland further agreed

that  "the $900,000 death benefits shall be available to the undersigned."  (*Id.*)  It is

undisputed that Karon Turner was "the undersigned" and that she was the sole owner of

the $900,000 policy.

        17.      Alice Turner concedes that Midland agreed that "Karon Turner would be

entitled to a death benefit of $900,000 upon the death of Wallace Turner."  (Alice

Turner's Proposed Determinations of Undisputed Facts, Doc. 34, at ¶ 37.)   Alice Turner challenges the settlement agreement on grounds that she was never notified about the litigation and first learned about when she received a copy of the summons and complaint in this case.  (*Id*. at ¶¶ 34 and 37.)  It is, however, undisputed that, at the time Wallace Turner and Karon Turner sued Midland and subsequently entered into the settlement agreement with Midland, which stated clearly that Karon would be entitled to the $900,000 proceeds, they could at will change the beneficiary of the $900,000 policy at issue.

18.     Karon and Wallace Turner divorced in 2002; however, Karon remained Wallace's companion and care-giver until his death on January 30, 2006.  ( Karon Turner Depo., Doc. 38-8, at p. 104.)  Following Wallace Turner's death, Karon contacted Midland and made a claim for the $900,000 in death benefits.

19.     Rather than complying with Wallace Turner's designation of Karon Turner as the primary beneficiary on the Application for the $900,000 policy and with its agreement in settlement of the aforementioned litigation to pay the $900,000 proceeds to Karon Turner, Midland National Life Insurance Company commenced this interpleader action on July 21, 2006, seeking a declaration from the Court as to identity of the person entitled to receive the $303,729.95 portion of the proceeds subsequently deposited with the Court.

20.     Karon Turner is clearly entitled to the insurance proceeds deposited in this Court.

8

## CONCLUSIONS OF LAW

1.      This interpleader action was filed by Midland National Life Insurance

Company  pursuant to Rule 22 of the Federal Rules of Civil Procedure.  Jurisdiction of

the Court was properly invoked pursuant to 28 U.S.C. §1332.

2.      As Alice Turner correctly points out, the designation of a beneficiary of a

life insurance policy, including the changes thereof, are governed under Alabama law by

the provisions of the policy.  *Ziegler v. Cardona*, 830 F.Supp. 1395, 1398 (M.D. Ala.

1993), *citing Gibson v. Henderson*, 459 So. 2d 845 (Ala. 1984).  However, strict

compliance may be waived by the insurer.  *Ziegler*, 830 F.Supp. at 1398, *citing Whitman*

*v. Whitman*, 225 Ala. 113, 142 So. 2d 413 (1932).  In a case such as this, where an

insurance company interpleads life insurance proceeds, it is held to have waived its

requirements under the policy relative to a change of beneficiary. *Ziegler*, 830 F.Supp. at

1398,  *citing McDonald v. McDonald*, 212 Ala. 137, 102 So. 38 (1924).

3.      As applied to the case at bar, Midland has interpled the life insurance

proceeds at issue and thus has waived its requirements under the $900,000 policy which

is the subject of this litigation, namely Policy Number 01420922.

4.      "As it relates to changing beneficiaries, the law of equity regards as having

been done that which ought to be done and the courts will give effect to the intention of

the insured by holding that a change of beneficiary has been accomplished where he or

she has done all that he or she could do in order to comply with the provisions of the

policy." *Ziegler*, 830 F.Supp. at 1398, *citing Gibson*, 459 So. 2d at 847.  This has come to

be known as the "substantial compliance" doctrine.  "The test of substantial compliance is whether the insured has done everything that he could do to make [a change of beneficiary]." *Ziegler*, 830 F.Supp. at 1398, *citing Gibson*, 459 So. 2d at 84.  As applied to the case at bar, Wallace Turner and Karon Turner clearly did everything they could do to designate Karon Turner as the beneficiary to the $900,000 policy at issue.  On September 25, 1987, Karon Turner was designated as the "primary beneficiary" on the application form (Doc. 35-11 at pp. 3 and 8).  Wallace Turner also made his intent clear from the outset as established by the testimony of his agent, Cassimus, who confirmed that, at the time the three policies were converted into the $900,000 policy, Wallace Turner "understood that [Karon Turner] was the beneficiary of the $900,000 [policy]." (Cassimus Depo., Doc. 38-6, at p. 69.)  Neither Wallace Turner's intent nor his conduct ever wavered as evidenced by the lawsuit he brought with Karon Turner against Midland in 1998 which resulted in a clear declaration in a settlement agreement between the parties that Karon Turner, and only Karon Turner, was entitled to the $900,000 proceeds upon Wallace Turner's death.

     5.    Alice Turner also relies on *Stoker v. Compton*, 643 S.W.2d 895 (Tenn. Ct. App. 1981), in which the Court stated:

> On the principle that equity regards as done that which ought to be done, the courts will give effect to the intention of the insured by holding that the change of beneficiary had been accomplished ***where he had done all that he could do*** to comply with the provisions of the policy, as where he sent a proper written notice or request to the home office of the company but was unable to send the policy by reason of circumstances beyond his control, as where it has been

> lost, or was in the possession of another person who refused to
> surrender it or was otherwise inaccessible, or where he sent both the
> policy and a proper written notice or request and all that remained to
> be done were certain formal and ministerial acts on the part of the
> company, such as the indorsement (sic) of the change of the policy,
> and these acts were either not done at all or were done after the death
> of insured.  ***Of course, the rule is not applicable where insured has
> not done all that he reasonably could to meet the conditions of the
> policy.***

643 S.W.2d at 898 (citations omitted) (emphasis in original).   In *Gibson v. Henderson*,
459 So. 2d 845 (Ala. 1984), Bob Carl Long named his mother as the beneficiary to a
$22,000 life insurance policy obtained through his employer.  Following his mother's
death, Long executed a formal change of beneficiary form, which was witnessed by his
aunt (Gibson), naming one Henderson as the beneficiary. *Gibson*, 459 So. 2d at 846.
Fifteen months after executing the form, Long died without having mailed the form to the
insurance company or his employer. *Id.*  Thereafter, Henderson obtained the original
executed form and mailed it to the insurance company. *Id.*  Gibson filed suit against
Henderson, alleging that Long's estate was entitled to the life insurance proceeds because
Long never delivered the executed change of beneficiary form. *Id.*  Henderson
counterclaimed, asserting the executed change of beneficiary form was valid and
effective. *Id.*  On cross-motions for summary judgment, the trial court granted
Henderson's motion, thus holding Henderson was entitled to the life insurance proceeds.
*Id.*  On appeal, the Alabama Supreme Court reversed and remanded, stating, "Put simply,
the facts presented on the motion for summary judgment do not show conclusively that

Long had done all in his power, or taken every reasonable step, to comply with the policy

provision." *Id.* at 848.  The *Gibson* Court specifically held:

> "the beneficiary in an insurance policy may be effectively changed if
> insured substantially complies with the provisions of the policy for
> such a change of beneficiary.  The test of substantial compliance is
> whether insured has done everything that he could do to make the
> change."

Gibson, 459 So.2d at 848, *quoting, inter alia,  Magruder v. Northwestern Mutual Life*

*Insurance Company*, 512 F.2d 507, 509 (6th Cir. 1975).

6.      The case at bar bears little in common with *Gibson*.  It is undisputed that the

application form for the conversion of the three (3) $300,000 policies into the $900,000

policy at issue which designated Karon Turner as the primary beneficiary was delivered

to Midland via Cassimus.  And even had that not happened, the 1998 lawsuit made it

abundantly clear that Karon Turner was the beneficiary of the entire $900,000 proceeds.

In the Court's opinion, neither Wallace Turner nor Karon Turner were required to do

more.

7.      Alice Turner further relies on *Murphy v. Gibson*, 465 So. 2d 373 (Ala.

1985), in which Nasren Murphy, Jr. ("Nasren") in 1972 designated Mary Gibson, then

known as Mary Barnes, as the beneficiary of certain pension plan death benefits.

*Murphy*, 465 So. 2d at 374.  Mary Barnes left her husband to live with Nasren in

Birmingham, Alabama, as his wife until 1977 when she moved to North Carolina.  Nasren

and Mrs. Barnes remained in contact thereafter, even when both had married others.

Nasren had designated Mrs Barnes as the beneficiary on his employer's beneficiary

designation form but identified her as "Mary Murphy" while including her correct social

security number. *Id.* at 375.  In 1979, Nasren married Bettie Murphy.  Although he told

Bettie that she was the beneficiary of "everything he had," Nasren never changed his

beneficiary designation on his pension benefits and the testimony from his own brother

established that Nasren, one week prior to his death, knew Mrs. Barnes, now Mary

Gibson, was still the designated beneficiary of the pension benefits.  *Id.*   Following a

bench trial, the court ruled in favor of Mary Gibson, who was the named beneficiary. *Id.*

at 376.  The Alabama Supreme Court affirmed using the trial court's rationale, to-wit: that

Nasren made an *inter vivos* gift of the pension benefits to Bettie Murphy, but then

"changed his mind" and decided to leave pension plan benefits to Gibson. *Id.*  The Court

also noted that the trial court would have been "equally correct" to hold that there was

never an effective gift of the pension plan benefits to Bettie Murphy:

> Under another theory, on the other hand, the trial court's judgment is
> equally correct. That theory also requires, inter alia, an intention by
> the donor to make a gift. *Herbert v. Haggermaker*, 53 Ala.App. 15,
> 296 So.2d 915 (1974). Under the facts of this case, the trial court
> could have found that there was never any effective gift to Mrs.
> Bettie Murphy due to an absence of the requisite intent to effect the
> change. Not only did the trial court accept the testimony of Frank
> Murphy, the brother of the decedent, but that court also had before it
> an inconsistency between plaintiff's verified complaint and plaintiff's
> own testimony. In her verified complaint, plaintiff stated that she and
> her husband "appeared at the personnel office of Wood-Fruitticher
> and requested that the beneficiary under the ... Profit Sharing Plan ...
> be changed from Mary Barnes to his present wife, Bettie M.
> Murphy," and that "Wood-Fruitticher ... informed Plaintiff and her
> husband that this had been done." In her testimony at the hearing,
> plaintiff conceded that this was not true. The trial judge could
> consider this inconsistency along with other evidence in arriving at

> his conclusion on the facts adduced ore tenus. 18A Ala.Digest, Trial, Key No. 140(1). Accordingly, the trial court also could have concluded that Nasren did not entertain the necessary donative intent on behalf of Bettie Murphy prior to his death and, thus, could have reached the same result.

*Id*. at 377.

8.      Unlike *Murphy*, no evidence has been proffered that Wallace Turner ever expressed an intent to name Alice Turner as beneficiary to any of the $900,000 proceeds at issue in this case.  Quite to the contrary, it is undisputed that Wallace Turner intended from the outset to provide this $900,000 life insurance policy for the sole benefit of Karon Turner and did everything in his power to effectuate same.

9.      Alice Turner next argues that Wallace Turner's obligation under the divorce decree negates the designation of Karon Turner on the application for conversion executed on September 25, 1987.  In support thereof, Alice Turner relies on *Williams v. Williams*, 276 Ala. 43, 158 So.2d 901 (1963), in which the court held:

> An agreement by an insured, in consideration of the settlement of property rights by which he agrees to make his children the sole ***irrevocable beneficiaries*** of a policy of life insurance, vests them with an equitable interest therein which may not be defeated without their consent, and the insured cannot defeat the equitable right of a beneficiary by failing to act.  He could not, in equity, be allowed to take advantage of his own wrong in breaching the property settlement and his estate is in no better position.

158 So.2d at 46 (emphasis added).  Alice Turner also cites *Frawley v. U.S. Steel Mining Co., Inc.,* 496 So.2d 731 (1986), which applied the above principle espoused in *Williams* to a case to a different insurance policy than that designated in the divorce decree on the

14

grounds that the new policy was issued by the decedent's successor employer and was thus subsumed by the language in the divorce decree.  The Court agrees that, had Wallace Turner died prior to January 1, 1984, Alice Turner would have had a vested equitable interest in any $600,000 proceeds paid under any life insurance policy naming Wallace Turner as the insured by virtue of the divorce decree.  Similarly, the Court agrees that, had Wallace Turner died after January 1, 1984, but before February 1, 1989, Alice Turner would have had a vested equitable interest in $350,000 of any proceeds paid under any life insurance under which Wallace Turner was insured despite his designation of a beneficiary to the contrary.  However, unlike *Williams* and *Frawley* in which the divorce decrees dictated an ***irrevocable beneficiary*** designations, Alice Turner's vested equitable interest lapsed on February 1, 1989, when Wallace Turner ceased to be obligated to maintain any insurance for her benefit.  As of February 1, 1989, the prohibition against Wallace Turner's efforts to name Karon Turner as the beneficiary of all his life insurance evaporated and Alice Turner was no longer vested with any right to complain.  Put another way, Alice Turner could not have been damaged by Wallace Turner's actions prior to February 1, 1989, because Wallace Turner outlived his obligations under the divorce decree.

10.     Similarly, Alice Turner's contention that the settlement agreement reached between Wallace and Karon Turner and Midland in the litigation commenced in 1999 is somehow negated by the fact that Alice Turner, whose vested interest in any insurance policy lapsed on February 1, 1989, never received any notice of the litigation is specious,

regardless of whether the $900,000 policy is deemed a new policy or a reinstated policy.

Alice Turner cannot seriously contend that Wallace Turner was not free as of February 1,

1989, to change at will any perceived designation of Alice Turner as a beneficiary under

any insurance policy or that she possessed any right to stop him from doing so at that

time.  Consequently, Alice Turner's reliance on *Aither v. Estate of Aither*, 913 A.2d 376

(Vt. 2006), is misguided at best.  In *Aither*, the wife sought to enforce an initial temporary

order issued on February 14, 2005, barring her husband, Jeffrey Aither, from disposing of

any marital asset during the pendency of their divorce.  Among the assets existing at that

time was a universal life insurance policy in the amount of $100,000 that named the wife

as the beneficiary.  Despite the court's order, Jeffrey Aither, on March 1, 2005, removed

his wife as the beneficiary and substituted his father and sister. Jeffrey Aither then died on

March 27th.  The only reason the *Aither* court required the presence of the named

beneficiaries was because the record at that stage of the divorce proceedings was

insufficient to determine the parties' respective rights to the marital property.  913 A.2d at

380-81.  In other words, the divorce court had yet to determine whether it was even

appropriate to require Jeffrey Aither to maintain his wife as the beneficiary of the policy

in question.  Unlike Alice Turner, Jeffrey Aither's father and sister may have had rights

under their designation as beneficiaries, certainly if the divorce court ultimately

determined that the wife had no right to the insurance policy.  Alice Turner's right to be

maintained as the beneficiary of any life insurance policy on Wallace Turner, and thus her

right to interfere with any litigation brought by Wallace Turner against Midland in 1999,

16

abated on February 1, 1989, before the lawsuit was filed and long before Wallace Turner died.

**CONCLUSION AND ORDER**

For the reasons stated above, the Court concludes and it is therefore **ORDERED** that the motion for summary judgment filed by Karon B. Turner is due to be and is hereby **GRANTED** while the motion filed by Alice Bats Turner is due to be and is hereby **DENIED** and that **JUDGMENT** be entered in favor of Karon B. Turner and against Alice Bats Turner in that Karon B. Turner is hereby declared entitled to all insurance proceeds paid into the registry of this Court by Midland National Life Insurance Company, plus any interest accrued less such sums to which this Court is entitled pursuant to federal law.   Costs incurred by Karon B. Turner are hereby taxed against Alice Bats Turner and Midland National Life Insurance Company in equal shares.

It is **FURTHER ORDERED** that, upon receipt of a written request to the Clerk of this Court from or on behalf of  Karon B. Turner, which includes a designation of the person or entity to whom the check is to be made payable, the appropriate tax identification number or Social Security number of the payee, and the address where such is to be mailed, the Clerk of this Court may distribute the aforementioned funds accordingly.

**DONE** this 2nd day of August, 2007.

_____s/ W. B. Hand_____
SENIOR DISTRICT JUDGE

17
